OPINION
{¶ 1} Defendant-appellant Antonio K. Swad appeals the October 21, 2002 Judgment Entry of the Fairfield County Court of Common Pleas, Domestic Relations Division, which overruled his objections to the magistrate's January 11, 2002 Decision with regard to child support. Plaintiff-appellee is Cheryl Ann Zartman.
 STATEMENT OF THE FACTS AND CASE {¶ 2} The trial of this matter was heard on August 21 and 22, 2000. However, over one half of the record of the hearing was not preserved due to a malfunction in the trial court's tape recording equipment. Because the transcript only included the direct and cross examination of a representative of the child support agency, and the cross examination of appellant, the trial court ordered a preparation of a statement of facts pursuant to App.R. 9. Because there were conflicts in the proposed statement of facts presented by appellant and appellee, the magistrate settled the record pursuant to App.R. 9(C). Thereafter, the trial court approved the magistrate's statement. In light of this unique procedural posture, our statement of facts is drawn from the August 1, 2002 Magistrate's Statement of Facts.
 {¶ 3} Appellee and appellant first met in Columbus, Ohio, while both worked in the restaurant business. Both parties described their relationship as very "physical" and both acknowledged they had sexual intercourse on a number of occasions throughout their relationship. Appellant testified he first met appellee in 1981 or 1982 and dated off and on for 2 ½ to 3 years. Appellee testified they dated on and off from 1978 through 1981 and had at least one date in 1982. Appellant testified the couple had only one date in 1982, when the couple went to Kings Island. The parties engaged in sexual intercourse on this occasion. Appellee testified he did not use a male contraceptive during this sexual encounter, and assumed appellee had used birth control. Appellant acknowledged they did not discuss the birth control issue. The child, Richard, was conceived in 1982, and born March 27, 1983.
 {¶ 4} Appellee testified she completed the child's birth certificate but was not permitted by hospital staff to list appellant as the father because he was not there to sign the birth certificate. The name on the certificate was, therefore, left blank.
 {¶ 5} Appellant testified she had no contact with appellee during her pregnancy except for a chance encounter at K-Mart when she was eight months pregnant. She testified she made eye contact with appellant but did not speak to him. She further testified she made no effort to contact appellant during her pregnancy.
 {¶ 6} Appellee testified she went to see appellant when Richard was nine days old. She told appellant Richard was his son and asked appellant to become a part of Richard's life. While she was there, appellant pulled a copy of the child's birth certificate from the top of the refrigerator. At that time, appellant stated he was not the father because his name was not on the birth certificate. Appellee testified appellant had no interest in seeing the baby and that he said that a baby did not fit into his life at the time. Appellant told appellee if she pursued him for money, he would attempt to gain custody of the child. Appellee was shocked and angry appellant already had a copy of the birth certificate. Only appellee and appellant were present during this meeting in his kitchen. Appellant does not recall this meeting.
 {¶ 7} Wanda Beery, appellee's sister, was also called to testify. Ms. Beery and appellee resided together on Elder Road in Lithopolis, beginning in the fall of 1982 while appellee was pregnant. Ms. Beery testified Richard was about one month old when appellee went to see appellant. Ms. Beery watched the baby while appellee met with appellant. When appellee returned from the meeting, she was hurt and upset. Ms. Beery testified Richard always knew appellant was his father and that there were pictures of appellant around the house for the child.
 {¶ 8} As a result of her meeting with appellant, appellee made the decision not to pursue appellant for child support. Between the time of the meeting with appellant in 1983, and October, 1996, appellee made no effort to establish paternity.
 {¶ 9} Appellant did not recall the meeting in 1983. However, he did admit he obtained a copy of the birth certificate from the Department of Health after a mutual friend had seen appellee and Richard together when Richard was a baby. The mutual friend had been told by appellee appellant was Richard's father. Appellant testified Richard's last name on the birth certificate was Mullons (appellee's name at the time of the birth), and the father's name had been left blank.
 {¶ 10} Appellee testified she had contact with appellant on two other occasions following Richard's birth, and before the CSCA action to establish paternity began. She testified while she was working as a waitress at Chi Chi's, she saw appellant. She further testified she had a chance meeting with appellant at a Ramada Inn when Richard was a few months old. Appellee had stopped there for a drink on the way home from work and appellant happened to be there for his going-away party. She testified she and appellant danced together at the party. It was during that evening appellee learned appellant was relocating to Texas. She testified she mentioned Richard before he left, but appellant did not express any interest in seeing the child. She testified she did not see appellant again until 1998 at the CSCA. Appellant did not recall either of these meetings.
 {¶ 11} Appellee testified she knew appellant was moving to Texas. She testified she knew Russell Houck, appellant's brother. Appellant testified his brother Russell had continuously lived in the Columbus/Kirkersville area since 1983. Appellant also had other relatives in Columbus, including relatives owning and operating the Bill Swad Chevrolet Dealership. Appellee also knew of these relatives. However, she never contacted any of appellant's family members in order to find him.
 {¶ 12} Appellant testified he left Ohio in 1984 and moved to Texas. He then moved to upstate New York and lived there for thirteen months. He moved back to Texas in 1986, and has resided in Texas ever since. He further testified upon his return to Texas in 1986, he had a listed telephone number for the first seven or eight years. Appellant testified he also used the same social security number, and always filed tax returns. Appellant did not use any aliases, although he did begin going by the first name Antonio when he entered the pizza business.
 {¶ 13} From the date of Richard's birth, to the time of trial, appellee has continually resided in Fairfield County, Ohio. Her name remained the same from her birth through the date she married David Zartman in 1996. Her telephone number has always been listed in the telephone book.
 {¶ 14} Appellee testified she made an appointment with CSCA in 1996 for three reasons. First, Richard wanted to contact his father. Second, she testified she had an angry day and was upset. Finally, appellee decided Richard deserved his father's love and support. She testified she did not contact CSCA earlier because appellant had told her he did not want Richard in his life. She lost contact with appellant when he moved to Texas and did not know how to find him. She testified she did not know of the CSCA in 1983, when Richard was born, but never made any inquiry into how paternity could be established. She testified she learned of the CSCA in the early 1990.
 {¶ 15} Appellant testified he did nothing upon obtaining the birth certificate of the child because he felt there was no reason to believe the child was his. He testified he had sexual intercourse with appellee only one time near what could have been the child's conception date (the trip to Kings Island). He further testified he believed he was not the father because appellee did not contact him after the trip to Kings Island. He also believes he is not the father of the child because the name of the father was left blank on the birth certificate. Appellant testified he knew it was biologically possible the baby was his.
 {¶ 16} Richard testified he was always told appellant was his father. He testified he had pictures of his father while growing up. Appellee testified when Richard was three to four years old, he would ask where his father was. This did not, however, cause appellee to look for him, even though she believed Richard had suffered emotional damage due to the lack of his father presence.
 {¶ 17} Appellee acknowledged while it is possible to make a retroactive child support award, it is very difficult for Richard and appellant to establish a relationship after all these years. She testified it was true it would have been easier to establish a father son relationship when Richard was two, rather than seventeen years old.
 {¶ 18} Both parents testified Richard has an above average intelligence. However, both parents indicated Richard is not a highly motivated child. He has not lived up to academic potential and has had a problem seeing things through to conclusion. Appellant testified Richard's school records indicated Richard was ranked 415 out of 432 in his class with a grade point average of 0.9. Appellant testified he had serious concerns regarding Richard's work ethic and lack of drive. Appellant testified from what he learned, Richard has had numerous employment positions since he turned 16. Appellant was further concerned over the lack of discipline and temperament and limited vocabulary. Appellant believes he could have been a positive influence on Richard. Appellee acknowledged appellant would have been a positive influence on Richard. Richard had an interest in the culinary arts, and appellant is very successful in the restaurant business. Appellant testified he is indeed Richard's biological father, but he has not had the opportunity to be his parent. Appellant testified he does believe one can go back and "buy time."
 {¶ 19} Appellant testified there were a number of activities he would never be able to enjoy with Richard because of his age. He was never able to participate with him in sports, scouts, camping, fishing, etc. Appellant summarizes his relationship with Richard by noting he has had closer relationships with some of his employees when they began working with him at Richard's age.
 {¶ 20} Appellant testified his efforts to establish a father son relationship with Richard after the determination of paternity. Appellant testified he attempted to meet the child when he was in Lancaster for court proceedings but was not permitted to do so. The first time appellant met his son was at the Dallas Airport in January or February of 1999. Appellant testified he was only able to recognize the child because he was with appellant's sister. Appellant described the visit as strained, and Richard spent the
 {¶ 21} first night of the visit in a hotel with appellant's sister. Appellant characterized Richard as a "guest."
 {¶ 22} Richard returned for a second visit with appellant in the summer of 1999 for approximately ten days. Appellant testified the relationship was strained and initially Richard was distant. Appellant did indicate, however, that over the ten day visit the relationship improved to the point where appellant was able to have meaningful discussions with Richard regarding pending custody issues. Following these discussions, appellant made the decision to drop his motion for custody which was dismissed in November 1999.
 {¶ 23} Chris Veidt, an attorney and legal coordinator with the Fairfield County CSCA, testified CSCA records indicated appellee first called and scheduled an appointment with CSCA on October 16, 1996. The first face to face meeting with appellee took place on October 30, 1996. During this meeting, appellee was asked to complete forms. She left current location information for appellant and did have his social security number.
 {¶ 24} Mr. Veidt testified after appellee completed the forms, CSCA made local attempts to locate appellant until August of 1997. The information was then submitted into the Ohio Parent Locator System. In 1998, location information was obtained. Appellant was first served with the document alleging he was father of the child in July, 1998, after Richard's fifteenth birthday.
 {¶ 25} R.C. Stoughton, an attorney who has practiced domestic relations law since 1979, testified about the technique used at Fairfield County to determine the child support obligation of non-custodial parents prior to the enactment of the child support guidelines. Mr. Stoughton testified child support awarded prior to the establishment of the guidelines was basically left up to the judge's discretion. Because a judge would consider the budgets of the parties and their incomes and that child support orders prior to the guidelines were generally in the range of $35 to $50 per week however the determination was fact intensive and decided on a case by case basis.
 {¶ 26} Appellant voluntarily appeared for an administrative determination of paternity and DNA testing was completed. The testing established appellant was the father of the child by a probability of 99.99%. There were negotiations between the parties to resolve other issues but no agreement was reached.
 {¶ 27} A complaint to establish paternity was filed on April 26, 1999, when Richard was 16. Appellant filed responsive pleadings to the complaint to establish paternity, a complaint for custody and a third action in the common pleas court. The parties engaged in discovery. An Agreed Entry of Paternity was filed in July of 1999. After the agreed entry, appellant made voluntary payments to appellee as support of the child in the total amount of $3,600. Appellant also changed the health insurance coverage for his entire company to provide coverage for Richard. Appellant's business previously participated in a health insurance plan offered by the State of Texas which was available only to Texans. In order to provide coverage for Richard, appellant obtained private health insurance for his business.
 {¶ 28} On October 13, 1999, a temporary child support order in the amount of $2,082.08 per month plus processing fee was issued. Appellant filed a motion to modify the order and his motion was consolidated with the final hearing.
 {¶ 29} When appellant returned to Texas in 1986, he successfully opened a pizza store which has expanded to four locations. Appellant also opened another restaurant called Wingstop. The pizza stores and Wingstop restaurant are both operated as sole proprietorships. In addition to the restaurants, appellant formed a corporation to franchise the Wingstop concept. Appellant testified the Wingstop was incorporated for the sole purpose of franchising, and as of the date of trial, the corporation had made no profit and that all monies earned by the corporation were being invested in the business. The only income to appellant from the corporation was a salary he had established due to the trial court's order of temporary child support.
 {¶ 30} Appellant received income from the pizza business and Wingstop, which as noted, are sole proprietorships under appellant's social security number for tax purposes. Pursuant to Texas law, however, appellant's wife is one-half owner, the parties stipulated one half of appellant's adjusted gross income for 1998, 1997, 1996 and 1995 belong to appellant's wife. Appellant further testified much of the income reflected on his tax return was also reinvested in the company. For purposes of these proceedings, the parties stipulated appellant's income based upon his tax returns and social security number benefit statements were filed with the court on August 23, 2000.
 {¶ 31} At the time of trial, appellant had prepared his 1999 tax return having received an extension until October 15, 2000. However, appellant testified his income from 1999 would be comparable to his 1998 income. Appellant's income exceeded $150,000 annually for 1997, 1998, and 1999.
 {¶ 32} Appellant testified his household income in 1998 was in excess of $700,000. He testified he paid cash for cars and he owned two homes at the of time trial and he was building a new home on a property he owned worth approximately $1,000,000 upon completion. Appellant testified he had no personal debt.
 {¶ 33} The parties stipulated to appellee's income for all of the years in question. Appellee changed employment during the pendency of the case. At that time of trial, she worked at Bob Evans and had an income of $32,000 with health insurance available to Richard. The cost for appellee to maintain medical insurance was $826.80 per year. Appellee's husband works as a carpenter and earns $13.00 per hour.
 {¶ 34} Most of Richard's life, appellee shared living expenses with another adult. She was able to provide Richard with the necessities, but he did not have luxuries. Appellee testified when she could not provide for Richard on occasion, her family did. Appellee testified she had no debt.
 {¶ 35} As to her current need for support, appellee testified the total household expenses were $1,840 per month, excluding overhead expenses attributable to her husband. Since the temporary child support order, she purchased her first house in 2000, at a cost of $79,000 and leased a new car.
 {¶ 36} Appellee also presented evidence of attorney fees incurred in the prosecution of this matter and her defense of the related case filed in the general division. Appellee's attorney's bill through July 31, 2000, was $20,226.59. As of the same date, the total fees paid were $3,352.88 (which included the discovery sanction paid by appellant). Additional fees had occurred between July 31, 2000, and the trial date of August 21, 2000. The senior partner of appellee's counsel's law firm, testified to reasonableness of appellee's fees. Attorney Stroughton also testified as the reasonableness of the fees. The fee agreement entered into between appellee and counsel provided for enhancement based upon result obtained. The fee bills actually admitted in this case reflected rounding and marking up of the fee bill with 3.5% added for overhead costs.
 {¶ 37} In spite of the attorneys testifying to the reasonableness of the fees, no testimony was offered breaking down the attorney's fees incurred in addressing the various issues that have arisen in this case including the establishment of paternity and support, the custody issues, the companionship issues, discovery, and the law suit filed in the general division.
 {¶ 38} Appellee was awarded and received attorney fees in the amount of $1,298 for discovery sanctions which occurred during the pendency of the matter sub judice before the involvement of appellant's present counsel. Appellant testified he had been "a bad boy" in regard to discovery issues and paid the attorney fee award. Prior to the trial in this case and while appellant was represented by his first attorney, appellant was extremely uncooperative in regard to discovery. Appellant testified he had incurred attorney fees of approximately $8,000 prior to trial.
 {¶ 39} The magistrate issued her decision on January 11, 2002. In the decision, the magistrate rejected appellant's defense in toto. On October 13, 2002, appellant filed objections to the magistrate's decision and requested a transcript of the trial. After learning the transcript had been lost, appellant requested a conference with the trial court. On May 14, 2002 the trial court conducted the conference off the record. However, in a May 24, 2002 Judgment Entry, the trial court memorialized the conference and ordered the parties to prepare a statement of the facts pursuant to App.R. 9. This judgment entry also noted appellant's objections to the trial court's order that a preparation of the statement of facts take place pursuant to App.R. 9.
 {¶ 40} Both parties submitted proposed statements pursuant to App.R. 9. On August 1, 2002, the magistrate reconciled the parties' statements and issued a magistrate's statement of facts.
 {¶ 41} On August 23, 2002, prior to the trial court ruling on appellant's objections, appellant filed a motion for a new trial based upon the lost transcript. On August 23, 2002, appellant filed supplemental objections to the magistrate's decision. Appellant did not request or receive leave to file the supplemental objections.
 {¶ 42} In an October 21, 2002 Judgment Entry, the trial court overruled appellant's objections and supplemental objections to the magistrate's decision. The trial court did not rule on appellant's motion for a new trial.
 {¶ 43} Appellant appeals the October 21, 2002 Judgment Entry assigning the following errors for our review:
 {¶ 44} "I. THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW IN FAILING TO SUSTAIN THE DEFENDANT'S LACHES/WAIVER DEFENSE FOR ALL CHILD SUPPORT ACCRUING PRIOR TO OCTOBER 19, 1999.
 {¶ 45} "II. THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION IN FAILING TO APPLY AM. SUB. 242 TO THE FACTS OF THIS CAUSE.
 {¶ 46} "III. THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO GRANT A NEW TRIAL IN THIS MATTER DUE TO THE LACK OF A TRANSCRIPT, THROUGH NO FAULT OF DEFENDANT/APPELLANT.
 {¶ 47} "IV. THE TRIAL COURT ERRED AS A MATTER OF LAW IN ORDERING ATTORNEY'S FEES IN THIS CAUSE.
 {¶ 48} "V. THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO TERMINATE CHILD SUPPORT EFFECTIVE MARCH 27, 2002."
 I {¶ 49} In appellant's first assignment of error, he maintains the trial court abused its discretion in failing to apply the defense of laches/waiver for all child support accruing before October 19, 1999. We disagree.
 {¶ 50} The decision of a trial court concerning the application of the doctrine of laches will not be reversed on appeal in the absence of an abuse of discretion. Payne v. Cartee (1996), 111 Ohio App.3d 580,590, 676 N.E.2d 946, 952-953. An abuse of discretion is more than just an error in judgment, but rather implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Booth v. Booth (1989),44 Ohio St.3d 142, 144, 541 N.E.2d 1028, 1030-1031.
 {¶ 51} Laches is an equitable doctrine. It has been defined by the Ohio Supreme Court as "an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party. Connin v. Bailey (1984), 15 Ohio St.3d 34, 35,472 N.E.2d 328 quoting Smith v. Smith (1959), 168 Ohio St. 447,156 N.E.2d 113. Delay in asserting a right does not of itself constitute laches, and in order to successfully invoke the equitable doctrine of laches it must be shown that the person for whose benefit the doctrine will operate has been materially prejudiced by the delay of the person asserting the claim. Connin, 15 Ohio St.3d at 35-36, 472 N.E.2d 328. See also: Smith, 168 Ohio St. at syllabus 3.
 {¶ 52} Appellant argues he has been materially prejudiced by the loss of a relationship with his son and the ability to participate in the rearing of his son during his formative years. In support of this proposition, appellant cites Fiskness v. Partin (Jan. 19, 1989, Richland App. No. No. C-2617, unreported. In Fiskness, this court found material prejudice to the parental relationship where the mother absconded with the minor child for a period of 6 1/2 years. For that period of time, the father had no means to locate the child and there was no possible relationship with the child.
 {¶ 53} The matter sub judice contains some significant differences. First, appellant knew the child was potentially his, and even obtained a birth certificate shortly after the child's birth to see if he had been listed as the father. Further, the trial court heard testimony appellee told appellant the child was his, but appellant chose not to establish a relationship with the child. Appellant knew appellee told friends appellant was the father. Finally, the trial court heard the child testify his mother always told him appellant was his father. Appellant made no effort to determine paternity or to otherwise establish a relationship with the child. It seems the only material prejudice herein was self-inflicted by appellee.
 {¶ 54} We see no abuse of discretion in the trial court's decision not to apply the doctrine of laches. Accordingly, appellant's first assignment of error is overruled.
 II {¶ 55} In appellant's second assignment of error he maintains the trial court erred in failing to apply H.B. 262, effective October 27, 2000, to the facts of this case. We disagree.
 {¶ 56} H.B. 262, codified in R.C. 3111.13, creates a statutory laches defense for alleged fathers, under certain circumstances. The statute requires, however, that the alleged father have no knowledge or reason to have knowledge of the alleged paternity:
 {¶ 57} * * * (F)(4)(a) A court shall not require a parent to pay an amount for that parent's failure to support a child prior to the date the court issues an order requiring that parent to pay an amount for the current support of that child or to pay all or any part of the reasonable expenses of the mother's pregnancy and confinement, if both of the following apply:
 {¶ 58} (i) At the time of the initial filing of an action to determine the existence of the parent and child relationship with respect to that parent, the child was over three years of age.
 {¶ 59} (ii) Prior to the initial filing of an action to determine the existence of the parent and child relationship with respect to that parent, the alleged father had no knowledge and had no reason to have knowledge of his alleged paternity of the child.
 {¶ 60} (b) For purposes of division (F)(4)(a)(ii) of this section, the mother of the child may establish that the alleged father had or should have had knowledge of the paternity of the child by showing, by a preponderance of the evidence, that she performed a reasonable and documented effort to contact and notify the alleged father of his paternity of the child.
 {¶ 61} In her response, appellee maintains R.C. 3111.13 is unconstitutional as it is violative of the doctrine of the separation of powers and as a retroactive law. However, even assuming arguendo, the statute is constitutional, we find the defense of laches as codified therein is unavailable to appellant.
 {¶ 62} As analyzed in appellant's first assignment of error, we find the trial court had significant, competent, credible evidence appellant had reason to know of his alleged paternity of the child. Even though the statute sets forth a way in which a mother "may" establish the alleged father should have known, the statute does not require such documentation.
 {¶ 63} Appellant's second assignment of error is overruled.
 III {¶ 64} In appellant's third assignment of error he maintains the trial court erred in failing to grant his motion for a new trial due to lack of a transcript because the transcript was unavailable through no fault of appellant and because the record could not be settled pursuant to App.R. (C) or (D). Appellant also argues the case was complicated by the fact the trial was held before the magistrate. Appellant maintains because the parties are entitled to an independent review by the trial judge when trials are conducted before a magistrate, the trial court could not make an independent analysis of facts and issues presented at trial because the transcript is incomplete. We disagree.
 {¶ 65} Civil Rule 53 governs the power of the magistrate and the responsibilities of the trial court relative to magistrate's decisions or objections. Specifically, the rule provides any objection to a finding of fact must be supported by either a transcript or by an affidavit of evidence if a transcript is not available:
 {¶ 66} "(E) Decisions in referred matters * * * Except as to those matters on which magistrates are permitted to enter orders without judicial approval pursuant to division (C)(3) of this rule, all matters referred to magistrates shall be decided as follows:
 {¶ 67} "(3) Objections * * *
 {¶ 68} "(b) * * * Any objection to a finding of fact shall besupported by a transcript of all the evidence submitted to the magistraterelevant to that fact or an affidavit of that evidence if a transcript isnot available. A party shall not assign as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party has objected to that finding or conclusion under this rule." (Emphasis added).
 {¶ 69} In the matter sub judice, appellant filed objections to the magistrate's decision before a transcript had been prepared. When appellant learned the transcript was not available, appellant filed supplemental objections to the magistrate's decision. The supplemental objections noted the transcript was unavailable, but did not include an affidavit of the evidence pursuant to Civ.R. 53(E)(3)(b).
 {¶ 70} While the rule was not followed in this respect, the record demonstrates the trial court ordered the parties to submit proposed statements of the evidence presented at trial in accordance with App.R. 9. Appellant did object to this procedure, and the objection was noted in the trial court's entry. While we would find appellant was required to attach an affidavit of evidence to the supplemental objections, we will treat the proposed unsworn statement of the facts, prepared at the direction of the trial court, as the functional equivalent of the affidavit required by Civ.R. 53(E)(3)(b).
 {¶ 71} Civ.R. 53 also dictates what a trial court may do when presented with objections to the magistrate's decision:
 {¶ 72} "(4) Court's action on magistrate's decision * * *
 {¶ 73} "(b) Disposition of objections. The court shall rule on any objections. The court may adopt, reject, or modify the magistrate'sdecision, hear additional evidence, recommit the matter to the magistratewith instructions, or hear the matter. The court may refuse to consider additional evidence proffered upon objections unless the objecting party demonstrates that with reasonable diligence the party could not have produced that evidence for the magistrate's consideration." (Emphasis added).
 {¶ 74} The trial court in the matter sub judice ordered the parties to submit proposed findings of fact and conclusions of law to the magistrate. The court also ordered the magistrate to reconcile and approve the facts and then submit an approved statement of facts to the court. May 24, 2002 Judgment Entry at p. 2. We find this action was consistent with Civ.R. 53(E)(4)(b), which permits the trial court to adopt the decision of the magistrate, or to resubmit the matter to the magistrate with additional instructions.
 {¶ 75} The trial court ruled on appellant's objections and supplemental objections in its October 21, 2002 Judgment Entry. In this entry, the trial court specified it had reviewed not only the magistrate's statement of the facts, but also the proposed statements presented to the magistrate by both parties:
 {¶ 76} "A reading of the plaintiff's, defendant's and magistrate's statements of facts seems to settle what the facts are pursuant to Ohio Appellate Rule 9(C) or 9(E).
 {¶ 77} "The Magistrate's Decision is detailed, comprehensive and appears to be correct." October 21, 2002 Judgment entry at p. 1.
 {¶ 78} We note Civ.R. 53 controls the trial court's rulings on a magistrate's decision. The Rule does, in fact, contemplate the unavailability of a transcript and provides a mechanism to correct the problem (the filing of an affidavit). The rule permits the trial court to adopt the magistrate's decision, or to resubmit the matter to the magistrate for further proceedings. In this case, the trial court resubmitted the matter to the magistrate and used Appellate Rule 9 as an analogous mechanism to develop the record. The trial court then reviewed not only the magistrate's statement of facts, but also the proposed statements of each party.
 {¶ 79} We concede Civ.R. 53 is less than clear about the procedure to be followed in a "no transcript" situation. Specifically, the rule does not create a mechanism for the non moving party to provide an affidavit. As vague as the rule is, we find the trial court conducted an appropriate review by asking the parties to provide 9(C) statements in this instance. Because the trial court's actions were permitted by Civ.R. 53, we find no abuse of discretion in the trial court's decision to adopt the magistrate's decision.
 IV {¶ 80} In appellant's fourth assignment of error, he maintains the trial court erred in ordering attorney fees in this case. We disagree.
 {¶ 81} An award of attorney fees is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. Swanson v. Swanson (1976), 48 Ohio App.2d 85, 2 O.O.3d 65,355 N.E.2d 894.
 {¶ 82} In any proceeding in which a court determines the amount of support to be paid pursuant to the support order, the court may include in its support order a statement ordering either party to pay the costs of the action, including, but not limited to, attorney's fees. R.C.3123.17(B). The standard of review for a trial court's award of attorney fees pursuant to R.C. 3123.17 is an abuse of discretion. In re: Marriageof Stearns (1993), 88 Ohio App.3d 264.
 {¶ 83} In its brief to this Court, appellant notes there is a split within the districts in the application of R.C. Chapter 3111 to litigants in a paternity action as opposed to litigants in a divorce action. The cases demonstrating this split are McQueen v. Hawkins
(1989), 63 Ohio App.3d 243, and Clark v. Joseph (1994), 95 Ohio App.3d 207. We note R.C. Chapter 3111 has been repealed since the decision in both of the cases, and recodified in R.C. 3123.17. The statute has remained substantially the same.
 {¶ 84} Our reading of the statute indicates it is not confined to divorce proceedings, but rather includes any action in which a trial court issues or modifies a support order. In both Clark and McQueen, the courts analyzed a potential equal protection violation. In the matter sub judice, neither party has raised a constitutional issue. Rather, appellant argues the attorneys did not include a breakdown of the portion of attorney fees attributable to child support as separate from issues regarding custody, companionship, medical insurance, and related issues. Because appellant did not raise an equal protection argument, we decline to address it at this time.
 {¶ 85} Because we see no abuse of discretion in the trial court's decision to award attorney fees as they related to this support order, appellant's fourth assignment of error is overruled.
 V {¶ 86} In appellant's fifth assignment of error, appellant maintains the trial court erred in failing to terminate the child support effective March 27, 2002, the child's nineteenth birthday. In her brief to this court, and at oral argument, appellee conceded the trial court erred in failing to mandate a termination of child support at the child's nineteenth birthday. Accordingly, appellant's fifth assignment of error is sustained.
 {¶ 87} The October 21, 2002 Judgment Entry of the Fairfield County Court of Common Pleas, Domestic Relations Division, is affirmed in part and reversed in part. The order is reversed only as to the termination date of child support. Therefore, we enter final judgment as to that issue, terminating the child support as of March 27, 2002.
By: Hoffman, P.J., Wise, J., and Edwards, J. concur.